IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CHARLES REEDY, | § | |
| TDCJ No. 02279500, | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| V. | § | A-24-CV-069-RP |
| | § | |
| BOBBY LUMPKIN, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| **Respondent.** | § | |

## ORDER

Before the Court are Charles Reedy's ("Petitioner") pro se Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 1) and Respondent Bobby Lumpkin's Answer (ECF No. 16). Having reviewed the record and pleadings submitted by both parties, the Court concludes several of Petitioner's claims are either non-cognizable or procedurally defaulted from federal habeas review and denies Petitioner's remaining claims under the standards prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See* 28 U.S.C. § 2254(d).

## I.  Background

In July 2017, Petitioner was charged by indictment with murder. (ECF No. 26-10 at 4-5.) On August 16, 2019, a jury convicted Petitioner of murder and the trial court sentenced him to twenty-five years imprisonment. *State v. Reedy*, No. D-1-DC-17-300977 (450th Dist. Ct., Travis Cnty., Tex. Aug. 16, 2019). (ECF No. 25-2 at 150-52.) The following is a summary of the factual allegations against Petitioner:

> Glen Burford was found lying face down at a bus stop in central east Austin, bleeding to death. Paramedics responded to the scene, assessed his breathing, and immediately attempted to revive him. There was blood under his chest on the

sidewalk, smeared on his left arm, and on his t-shirt. He had a puncture wound near the bottom of his heart, which killed him.

Police officers responded to the scene shortly after the paramedics arrived. While waiting for homicide detectives, one of the first-responding officers saw Reedy sitting at the bus stop, a few feet away from Burford's body. Reedy was wearing an unstained, white t-shirt. The two talked, and the officer noted Reedy's slurred speech, bloodshot eyes, and odor of alcohol. Reedy grew frustrated and wanted to leave, but the officer detained him. While the officer waited for detectives, Reedy volunteered that he knew and lived with the victim and talked with him earlier inside their house when Burford left to meet someone at the bus stop. Reedy later told police that he had been in Burford's room with him, although he claimed that they separated about 10 minutes before Burford was killed. Reedy said he "heard a disturbance out at the bus stop, he went to go check on what had happened, and that's where we found the victim at the bus stop" and saw paramedics working on the body.

Once a detective arrived, the officer handcuffed Reedy and put him in a patrol car. The car's audio- and video-recording equipment recorded Reedy, who was alone, saying, "Fuck, Glen. I'm sorry." Shortly after, Reedy, still alone, said, "My knife? I don't think so."

An apparent trail of bloodstains led from the bus stop to the house where Reedy and Burford lived together. Police found the house dark, dirty, and "unkept" and saw blood on the front doorframe. They found another housemate, Michael McGinnis, in his room and led McGinnis outside and handcuffed him. Reedy and McGinnis were not friends—the police had once been called out when McGinnis held a knife to Reedy's neck. McGinnis testified at trial that about 30 minutes before police led him outside, he heard heavy footsteps from someone "bound[ing]" upstairs, toward Reedy's second-floor bedroom.

Another roommate, David De La Rosa, testified that Reedy and Burford were friends and would drink alcohol and "fellowship together." Even so, leading up to the day in question, De La Rosa felt that Reedy and Burford "were having some kind of friction." Burford owed Reedy money. In fact, Reedy told De La Rosa that he "was ready to hurt" Burford, which De La Rosa considered a threat. Over the same period, McGinnis heard Reedy one day "beating on the walls and the door for a while, telling [Burford] he has an ass whooping coming and screaming 'faggot' at him."

Officers got a warrant to search the home. Inside, Sgt. Daryl Tynes, who was a detective at the scene, and a crime-scene specialist saw blood-like stains on the interior front door jamb on its left-hand side from the point of view of someone leaving the house to go outside. These stains suggested to Sgt. Tynes that a bleeding event happened inside the house with the screen door closed. When Sgt. Angie

Jones, the lead detective on this case, later looked at these stains, she thought they resembled a "hand swipe."

Sgt. Tynes, other detectives, and the crime-scene specialist continued searching the house and saw more apparent blood stains, on the room side of the door jamb of Burford's room on the first floor. When Sgt. Jones reviewed these later, they also looked to her like a "hand swipe," and their appearance and location on the room side of the door jamb suggested to her that "a bloodletting event" happened in Burford's room. They were on the left-hand side of the door jamb from the point of view of someone leaving the room to enter the hallway. Inside Burford's room was a sleeping bag with an apparent blood stain. The investigators did not notice any similar stains in any of the other rooms downstairs, save for the possible presence of blood on the bathroom sink. The only other blood-like stains were the trail of drops from Burford's room to the front door.

The investigators searched McGinnis's room and seized a stained pair of jeans and his hunting knife—a large, single-edged Bowie knife that was in its sheath. The stain on the jeans looked like blood, and McGinnis later explained that it was from when he was cut while on the bus and that he takes a blood thinner, which made the wound bleed a lot.

After going upstairs, the investigators seized from Reedy's bedroom a wallet with his ID in it, a cell phone, a steak knife, and a lock-blade knife "in the open position." The crime-scene specialist took photos of the lock-blade knife in part because of "unknown," "reddish/brown, rust colored" stains on it. But the investigators did not collect as evidence "any other T-shirts or clothing that was in [Reedy's] room." Nor did they find any other clothing on the property showing blood. Officers also gathered statements from a witness saying that someone had rattled the chain-link fence in the house's backyard and another saying that a person in a red hat ran through the alley behind the house when officers were first entering it.

The day of the murder, Reedy took the bus to borrow DVDs from the library and buy alcohol. A library employee saw him have an extended, "angry exchange" with another man—Burford—after the man asked Reedy for a nickel. The employee had never seen Reedy violent before, but Reedy's behavior this time made him concerned for library patrons and staff's safety.

That night at police headquarters, Sgts. Jones and Tynes interviewed Reedy the first of what would be three times. He was wearing a white t-shirt and white socks and shoes, all matching what he had worn earlier to the library, and there was no blood on any of his clothing. An officer took photos of him, including of his hands, which showed no sign of a struggle. Reedy, though heavily drunk, answered questions and both in this interview and in another repeatedly suggested that Burford had been shot. He said that an officer told him so, but the detectives knew, and did not divulge, that Burford was instead stabbed.

Recounting the evening's events, Reedy said that when he got home he went to Burford's room and that only they two were in the room. He said that while they talked, Burford suddenly told him to wait because Burford needed to meet someone outside, so he waited in Burford's room when Burford left. Just a few minutes later, Reedy said, he heard a noise outside. He said that he went out and saw the body on the ground but did not know that it was Burford. In his telling, Reedy was the last person to see Burford alive in the house before Burford fell outside about five to ten minutes later. He added: "It looks bad for me since I'm in his apartment when—right around the—whatever happened—he got shot, ya know?" At other times in the interview, although he said that he did not know how Burford had been hurt, he encouraged the detectives to focus on McGinnis. After the interview, Reedy signed a statement about the evening's events and left, and Sgt. Jones went to the house.

About two and half weeks later, Sgts. Jones and Tynes went to Reedy's house to interview him there. They still did not arrest him, but he asked them, "Did you all take my steak knife too?" and explained, "I was gonna cook something and didn't have my steak knife."

Over a month later, after Reedy's murder arrest, Sgts. Jones and Tynes interviewed him again. He changed his story and claimed that he went to his own room before going to Burford's that night, explaining that he had wanted to go to the grocery store but forgot his wallet. But, in his own telling, he again forgot his wallet when he left his room and went to Burford's.

The State indicted Reedy for murder, and the case proceeded to a jury trial. The State called as witnesses Sgts. Jones and Tynes, McGinnis, De La Rosa, a paramedic, a responding police officer, the crime-scene specialist, and others. Among the others was the medical examiner who performed the autopsy. She explained that Burford died of a stab wound to his chest and had other, non-fatal wounds. The stab wound was from "a sharp instrument"—potentially but not necessarily a knife—with a "single sharp edge and a blunt edge." The other wounds included six "sharp force injury wounds" on his left hand and its fingers, which she considered either "defensive wounds" from a "close-encounter assault or an attack" or wounds resulting from Burford's himself being the aggressor. The injuries to Burford's left hand, according to Sgt. Tynes, matched the apparent blood stains on the left-hand side of Burford's bedroom's door jamb.

Based on Burford's wounds, the medical examiner would have expected to see blood transferred from Burford to whoever fought him. And the fatal stab wound would not have kept Burford from leaving the house and only then collapsing in a neighboring lot. He could have wandered a few minutes before dying. The medical examiner also took samples from Burford's hands and fingers, and samples like those, if tested, can contain an assailant's DNA.

The State also called as a witness a DNA analyst who was involved with testing evidence, including known samples of DNA from Reedy and Burford. The analyst

4

and her colleagues DNA-tested five samples taken from spots on the lock-blade knife seized from Reedy's room. The analyst "believe[d]" that there was "blood found on the evidence" tested by her lab. Tests of samples from the knife's blade revealed Burford to be the "major male contributor" of the DNA recovered and that it was likely that this was indeed Burford's DNA on the knife. Tests of the other samples left the analyst unable to exclude either Burford or Reedy as contributors to the DNA found. And a test from a sample from the knife's handle showed the likely presence of Reedy's DNA. The analyst's lab also tested samples taken from the stain on the jeans seized from McGinnis's room, but neither Reedy's nor Burford's DNA was detected.

On cross-examination, the analyst admitted that her lab used an expired reagent at one step of its work here and that this mistake could have changed certain results. But she later clarified that the reagent issue would not change her conclusions here. She also acknowledged that the serologist whose work on the case came before her own had once failed a proficiency test and no longer worked for the lab because he took a job with the Colorado Bureau of Investigation.

Reedy called a forensic-DNA consultant, who testified that it was the serologist here who would have decided whether a particular bodily fluid like blood, semen, or saliva was present in a sample. The consultant also raised the expired-reagent problem in the lab's work and confirmed that this could have changed certain test results. She next pointed out chain-of-custody problems in the lab's paperwork— the records showed (a) that certain samples were tested before they were even received by the lab and (b) that the serologist neglected to make the kind of notes about how the lab received the samples that the consultant would consider to be standard practice. In both instances, the consultant thought the lab's work below standard and that it could subject the lab to an audit. The consultant noted still other problems with the lab's work: a contamination issue and an instance of having used the wrong quantitation program, both of which created wasted time and effort and required certain steps in the work to be redone. Finally, the consultant thought it unsurprising that Burford's DNA might be on Reedy's knife because the two men lived in the same house, the house was "unkept," and DNA can stay on an item for a long time.

Reedy also called the forensic psychologist/neuropsychologist who treated him. He opined that Reedy suffers from a mental disease or defect stemming from several problems. Because of the mental disease or defect, he thought it "possible" that Reedy would be unable to form intentional or knowing mental states and would instead be "reckless" in his conduct when an unimpaired person would otherwise be acting intentionally or knowingly. He noted Reedy's impairments in daily life and diagnosed him with mild neurocognitive disorder due to traumatic brain injury, vascular risk factors affecting the flow of blood and oxygen to the brain, chronic effects of alcohol, unspecified neurodevelopmental disorder, borderline intellectual functioning, specified trauma, stressor-related disorder, unspecified bipolar

disorder, alcohol-use disorder/chronic alcohol dependency, and antisocial personality disorder.

Through interviewing and testing, the psychologist learned about a pediatric head injury of Reedy's; indications in his medical records of seizures; and many other conditions that compromise the flow of blood and oxygen to his brain, which slows processing speed and can undermine memory. Relatedly, Reedy is "not the greatest historian" and is "sometimes inconsistent," as with reporting memories. And his chronic alcohol dependence may also have affected his brain structure and function.

Reedy's test results put him in the third percentile for IQ and revealed "significant problems with reasoning and problem solving" and "attention," including that "he was not always correctly oriented, especially to date." His verbal comprehension is deficient and verbal skills significantly impaired, and he has a mildly impaired memory, struggles with social comprehension and judgment, has a severe impairment with following auditory commands and with auditory comprehension, and has impulse-control problems. The psychologist tested Reedy for malingering and concluded that Reedy was not trying to fake any symptoms to avoid criminal responsibility.

On cross-examination, the psychologist acknowledged that antisocial personality disorder, like Reedy's, involves violating others' rights. He also confirmed that Reedy was able to understand right from wrong. Finally, he admitted that by going out to rent DVDs and buy and drink alcohol on the day in question, Reedy was able to form intentional or knowing mental states to accomplish those acts.

To rebut the psychologist's testimony, the State called a court-appointed forensic psychologist, who evaluated Reedy's sanity. She opined that he was sane at the time of the alleged murder. He showed lucid memory of that day and reported planning rational behaviors like going to the library, taking the bus, and buying alcohol. She also saw evidence of feigning psychiatric symptoms but no evidence of malingering memory. She concluded that he does not suffer from any mental disease or defect preventing him from (1) forming the intent to complete an act to fulfill a conscious desire of his or (2) knowing the likely result of any particular action of his.

After the close of the evidence, the trial court charged the jury on the offenses of both murder and manslaughter. After closing arguments and its deliberations, the jury found Reedy guilty of murdering Burford. …

*Reedy v. State*, No. 03-19-00573-CR, 2021 WL 2557950 at *1-5 (Tex. App.--Austin, June 23, 2021, pet. ref'd).

Petitioner raised two points of error in his direct appeal: first, that the trial court erred by admitting Sgt. Jones's opinion testimony that Petitioner was guilty of murder; and second, that the trial court erred by refusing to grant Petitioner's motion for a mistrial after the prosecutor's remark during closing argument that the victim's blood was on Petitioner's knife. The state court of appeals overruled both points of error and affirmed Petitioner's conviction on June 23, 2021. *Id.* Petitioner then filed a petition for discretionary review (PDR), only raising the first point-of-error from his direct appeal. The Texas Court of Criminal Appeals (TCCA) refused Petitioner's PDR on August 25, 2021. *Reedy v. State*, No. PD-0557-21 (Tex. Crim. App. Aug. 25, 2021). Petitioner did not file a petition for writ of certiorari with the United States Supreme Court. (ECF No. 1 at 3.)

On October 25, 2021, Petitioner executed his state habeas corpus application, listing the following seven grounds of relief:

1. He is illegally incarcerated based on a faulty indictment and convicted with no evidence of the offense charged and the indictment did not allege the essential elements of murder;

2. The trial court erred in overruling Petitioner's motion for mistrial after the prosecutor erroneously argued the victim's blood was on Petitioner's knife;

3. The trial court erred by allowing Detective Jones to testify that she believed Petitioner committed murder;

4. There were lab errors relating to the DNA evidence admitted into Petitioner's trial;

5. Petitioner received ineffective assistance of counsel when trial counsel failed to investigate, failed to pursue a speedy trial, did not object to hearsay witnesses, and did not object to the prosecutor's argument during closing that "this is a murder weapon" and that the knife had the victim's blood on it;

6. Petitioner is actually innocent and would not have been convicted but for the false evidence introduced at trial; and

7. Petitioner is illegally incarcerated because there is no evidence of the charged offense and no evidence of the essential elements of the crime.

(ECF No. 26-10 at 8-43.) On March 8, 2023, the TCCA denied Petitioner's state habeas application without written order. *Ex parte Reedy*, No. WR-67,078-02 (Tex. Crim. App. Mar. 8, 2023). (ECF No. 26-14 at 1.)

On December 15, 2023, Petitioner executed his federal habeas petition, listing the same seven grounds of relief that he listed in his state habeas application. Respondent Lumpkin answered the petition and argues that claim 6 is not cognizable in federal habeas; that claims 1, 4 and 7 are procedurally defaulted from federal habeas review; and that claims 2-3 and 5 are meritless. (ECF No. 24.) Petitioner has not replied.

## II. Standard of Review

Petitioner's federal habeas petition is governed by the heightened standard of review provided by AEDPA. *See* 28 U.S.C. § 2254. Under § 2254(d), a petitioner may not obtain federal habeas corpus relief on any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005). This demanding standard stops just short of imposing a complete bar on federal court re-litigation of claims already rejected in state proceedings. *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citing *Felker v. Turpin*, 518 U.S. 651, 664 (1996)).

A federal habeas court's inquiry into unreasonableness should always be objective rather than subjective, with a focus on whether the state court's application of clearly established federal law was "objectively unreasonable" and not whether it was incorrect or erroneous. *McDaniel v. Brown*, 558 U.S. 120 (2010); *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). Even a strong case

for relief does not mean the state court's contrary conclusion was unreasonable. *Richter*, 562 U.S. at 102. A petitioner must show that the state court's decision was objectively unreasonable, not just incorrect, which is a "substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007); *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). As a result, to obtain federal habeas relief on a claim previously adjudicated on the merits in state court, Petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103. "'If this standard is difficult to meet—and it is—that is because it was meant to be.'" *Mejia v. Davis*, 906 F.3d 307, 314 (5th Cir. 2018) (quoting *Burt v. Titlow*, 571 U.S. 12, 20 (2013)).

### III. Analysis

1. Actual Innocence (claim 6)

In Petitioner's sixth claim, he argues he is actually innocent of the crime, and would have been found innocent but for the false evidence introduced against him at trial. He alleges the State introduced "false evidence of statements and opinions" during closing arguments, which led the jury to convict Petitioner. Petitioner argues this is not a freestanding claim of actual innocence but rather a due process claim brought pursuant to *Schlup v. Delo*, 513 U.S. 298 (1995). Petitioner further argues the State knowingly introduced false evidence in support of his conviction, pointing to three statements made during the State's closing argument: first, the State told the jury this is the murder weapon; second, the State told the jury, "when you find the murder weapon, the weapon described by the defendant in the police car minutes after, you don't keep looking for more

weapons; and third, the State told the jury "when you get the DNA back that says yeah, the victim's blood is on the blade." (ECF No. 1-3 at 19-20.)

Freestanding claims of actual innocence based on newly discovered evidence do not provide a basis for federal habeas relief. *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000) (citing *Herrera v. Collins*, 506 U.S. 390, 417 (1993)). "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Herrera*, 506 U.S. at 399. Although the *Herrera* court left open the question of whether, in a capital case, "a truly persuasive demonstration of 'actual innocence' made after trial would . . . warrant habeas relief if there were no state avenue open to process such a claim," 506 U.S. at 417, the Fifth Circuit has consistently rejected this theory. *See Cantu v. Thaler*, 632 F.3d 157, 167 (5th Cir. 2011); *In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009); *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003) (collecting cases).

Petitioner specifically argues he is not bringing a freestanding actual-innocence claim, but rather a due-process claim pursuant to the standards described in *Schlup*. In *Schlup*, the Supreme Court stated that a convincing showing of actual innocence may enable a habeas petitioner to overcome a procedural bar to the consideration of the merits of a constitutional claim. *Schlup*, 513 U.S. at 329-32. But there are no procedural bars to Petitioner's claim that the State knowingly relied on false evidence to secure his conviction, and it is timely filed under the AEDPA statute of limitations. As a result, *Schlup* is not relevant.

To the extent Petitioner is trying to bring a claim of prosecutorial misconduct rather than a claim of actual innocence, he fails to show how the state habeas court's denial of his claim was objectively unreasonable. Allegations of prosecutorial misconduct are analyzed in two steps. *Trottie v. Stephens*, 720 F.3d 231, 253 (5th Cir. 2013) (citation omitted). The first is to evaluate

whether the prosecutor made an improper remark. *United States v. Fields*, 483 F.3d 313, 358 (5th Cir. 2007) (citation omitted). If so, the second step is to determine whether the defendant suffered prejudice. *Id*. This second inquiry sets a high bar: "Improper prosecutorial comments constitute reversible error only where the defendant's right to a fair trial is substantially affected." *United States v. Ebron*, 683 F.3d 105, 140 (5th Cir. 2012) (quoting *United States v. Holmes*, 406 F.3d 337, 355-56 (5th Cir. 2005)). A criminal conviction should not be "lightly overturned on the basis of a prosecutor's comments standing alone," but rather only when "the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *Id*. Thus, in deciding whether serious doubt infects the verdict, the Court considers three factors: "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." *Id*. (quoting *United States v. Mares*, 402 F.3d 511, 515 (5th Cir. 2005)) (internal quotation marks omitted).

Petitioner points to three statements made by the State during closing argument that he argues are false and led the jury to convict him. In denying this claim, the TCCA either concluded that the statements were not improper or that the statements were not prejudicial. Under the AEDPA, the state court's factual findings are afforded a presumption of correctness which Petitioner can only rebut with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Petitioner brings no evidence or arguments that would rebut the TCCA's factual findings, and thus fails to overcome that presumption of correctness.

Accordingly, to the extent Petitioner's claim is based on his actual innocence, it is non-cognizable in federal habeas review and denied. To the extent Petitioner is claiming his conviction

11

was secured through prosecutorial misconduct, he has failed to show that the state habeas court's rejection of this claim was objectively unreasonable, and it is denied.[1]

2. Procedural Default (claims 1, 4, 7)

In claims 1, 4, and 7, Petitioner argues there is insufficient evidence supporting his conviction. In claim 1 and 7, he alleges there is no evidence of the charged offense and no evidence of the essential elements of the crime as stated in the indictment. In claim 4, Petitioner challenges the DNA evidence admitted at trial, which the Court interprets as another challenge to the sufficiency of the evidence. Respondent argues these claims are procedurally defaulted from federal habeas review. Respondent is correct.

Before seeking review in federal court, a habeas petitioner must first present his claims in state court and exhaust all available state court remedies through a proper adjudication on the merits. *See* 28 U.S.C. § 2254(b)(1)(A) (federal habeas relief may not be granted unless it appears petitioner exhausted remedies available in the state courts). The exhaustion requirement is satisfied if the substance of the federal habeas claim was presented to the highest state court in a procedurally proper manner. *Baldwin v. Reese*, 541 U.S. 27, 29-32 (2004); *Moore v. Cain*, 298 F.3d 361, 364 (5th Cir. 2002). In Texas, this exhaustion requirement is generally satisfied if the substance of the claim was presented to the TCCA in a procedurally proper manner either through a PDR or through a state application for writ of habeas corpus. *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998).

---

[1] Petitioner also references a "faulty indictment" in his actual-innocence claim, but it is unclear whether he means to directly challenge the indictment. If so, the Fifth Circuit has held that "the sufficiency of a state indictment is not a matter for federal habeas relief unless it can be shown that the indictment is so defective that it deprives the state court of jurisdiction." *McKay v. Collins*, 12 F.3d 66, 68 (5th Cir. 1994). When a state court has held that an indictment is sufficient under state law, a federal court need not address that issue. *Evans v. Cain*, 577 F.3d 620, 624 (5th Cir. 2009); *see also McKay*, 12 F.3d at 68. Petitioner used this same wording in the claim he raised in his state habeas application, which the TCCA denied. Because the state court has already addressed the sufficiency of the indictment, his claim that the indictment was faulty does not provide grounds for federal habeas relief. Therefore, to the extent Petitioner is also challenging his indictment, this claim is denied.

If a petitioner "fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,'" then a petitioner's claim is procedurally defaulted from federal habeas review. *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)). A petitioner's state habeas claim is also subject to procedural default if "a state court clearly and expressly bases its dismissal of a prisoner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal." *Nobles*, 127 F.3d at 420. The only way for a petitioner to overcome a procedural default is either to show cause for the default and resulting prejudice, or to demonstrate that the federal court's failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750-51 (1991); *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir. 2004).

Texas courts have consistently held that claims of sufficiency of the evidence must be raised on direct appeal and are not cognizable in post-conviction writs of habeas corpus. *See Ex parte McLain*, 869 S.W.2d 349, 350 (Tex. Crim. App. 1994) (holding evidentiary sufficiency claims are not cognizable in post-conviction collateral attacks); *West v. Johnson*, 92 F.3d 1385, 1389 n.18 (5th Cir. 1996) (recognizing this legal principle under Texas law). Specifically, the TCCA has held that, "where an applicant challenges the sufficiency of the evidence on an application for a writ of habeas corpus, and we subsequently dispose of the application by entering a denial without written order, the applicant's sufficiency claim was denied because the claim is not cognizable." *Ex parte Grigsby*, 137 S.W.3d 673, 674 (Tex. Crim. App. 2004).

Petitioner did not raise claims 1, 4, and 7 in his direct appeal or his PDR. Instead, he raised them for the first time in his state habeas application, which the TCCA denied without written

order. *Ex parte Grigsby* is clear: by denying Petitioner's sufficiency-of-the-evidence claims without written order, the TCCA determined the claims were not cognizable in Petitioner's state habeas application. The TCCA's disposition of Petitioner's claims thereby constitutes an independent and adequate ground for dismissal based on a state procedural rule. *See Register v. Thaler*, 681 F.3d 623, 628 (5th Cir. 2012) (Petitioner's sufficiency of the evidence claim was denied on independent and adequate state ground when it was not raised on direct appeal and was not cognizable on state habeas review). Because Petitioner did not reply to Respondent's answer, he fails to show cause and resulting prejudice for this default, or why the Court's failure to consider these claims would result in a miscarriage of justice. As a result, claims 1, 4, and 7 are dismissed as procedurally defaulted from federal habeas review.

2. Trial Court Error (claims 2-3)

In Petitioner's next two claims, he argues the trial court violated his constitutional due process rights when it denied his motion for a mistrial after the Prosecutor stated in closing that the victim's blood was on Petitioner's knife (claim 2), and when it allowed Sgt. Jones to testify that she believed Petitioner had committed murder (claim 3).

The TCCA denied Petitioner's claim without written order. Generally, when reviewing a claim under the AEDPA's deferential standard, a federal court must look to the last reasoned state judgment that considered and rejected Petitioner's claim. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). In this case, the last reasoned state court decision was issued by the intermediate court of appeals.

The state court of appeals rejected Petitioner's second claim. The appellate court noted that the trial court did find the remark improper—it sustained Petitioner's objection to it—but then denied the motion for mistrial and instead reminded the jury that they were the "exclusive judges

14

of the facts." The appellate court noted that a mistrial is only warranted in "extreme cases for a narrow class of highly prejudicial and incurable errors" and then concluded the remark was not so extreme or manifestly improper that it would support reversible error. The appellate court further concluded that, in the alternative, the evidence introduced at trial supported the conclusion that the remark was a reasonable deduction from the evidence and therefore not improper at all. *Reedy*, 2021 WL 2557950 at *9.

It is well-settled in the Fifth Circuit that a federal court "[does] not sit as super state supreme court to review error under state law." *Bridge v. Lynaugh*, 838 F.2d 770, 772 (5th Cir. 1988). As a result, a trial court error only justifies federal habeas corpus relief if it was "so extreme that it constitutes a denial of fundamental fairness under the Due Process Clause." *Id*. Thus, to obtain relief, Petitioner must show that the trial court's alleged error had a "substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

In overruling Petitioner's claim on direct appeal, the state court of appeals concluded that the trial court had not abused its discretion in denying Petitioner's motion for a mistrial because, in their opinion, the prosecutor's statement was not improper but rather a reasonable deduction from the evidence presented at trial. In his federal petition, Petitioner focuses on the trial court's admonition to the jury after he sustained Petitioner's objection to the statement—"you shall remember the evidence as you heard it"—and argues this provided further support for the prosecutor's statement.

However, what the trial court specifically stated is, "And I will remind the jury that you are the exclusive judges of the facts in this case and you will remember the evidence as you heard it." (ECF No. 25-11 at 56.) Earlier, during the defense's closing, the trial court told the jury, "[t]he

jury will remember the evidence as they heard it. And, also, arguments of counsel are not evidence. They are merely statements as to what they believe the evidence showed." (*Id.* at 43.) The record, therefore, shows the trial court reminded they jury they—and not counsel—were the judges of facts; further, the trial court's statement that the jury should "remember the evidence as you heard it" was not a reinforcement of the prosecutor's statement but another reminder of the jury's exclusive role in deciding facts. Petitioner has failed to show that the trial court's denial of his motion for a mistrial had a substantial or injurious effect or influence on the jury's verdict, and thus has not shown that the state habeas court's denial of this claim was objectively unreasonable. It is denied.

The state appellate court also overruled Petitioner's third claim regarding Sgt. Jones's testimony. The appellate court first concluded that the trial court had abused its discretion in overruling Petitioner's objection and admitting Sgt. Jones's opinion that Petitioner was guilty of murder. The court went on to conclude, however, that the error did not warrant reversal. Rather, the court held that, pursuant to *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010), the error did not have a substantial or injurious effect or influence in determining the jury's verdict. The appellate court concluded it was "not left with 'grave doubt' about whether the result of the trial was free from the substantial influence of the error. . . . Although Reedy denied the murder and no witnesses saw him do it, there was still ample other evidence of his guilt, including from several sources besides Sgt. Jones." *Reedy*, 2021 WL 2557950 at *8. The court further concluded that "admitting Sgt. Jones's opinion 'had but a slight effect upon' the jury's deliberations." *Id.* (quoting *Coble*, 330 S.W.3d at 280).

It is not the province of a federal habeas court to reexamine state court determinations on state-law questions such as the admissibility of evidence under state procedural rules. *Estelle v.*

*McGuire*, 502 U.S. 62, 67-68 (1991); *Goodrum v. Quarterman*, 547 F.3d 249, 261 (5th Cir. 2008). A federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling also violates a specific federal constitutional right or renders the petitioner's trial fundamentally unfair. *Pemberton v. Collins*, 991 F.2d 1218, 1226 (5th Cir. 1993). The challenged evidence must be a crucial, critical, or highly significant factor in the context of the entire case. *Gonzales v. Thaler*, 643 F.3d 425, 430 (5th Cir. 2011). An error makes a trial "fundamentally unfair" if there is a reasonable probability that the verdict might have been different had the trial been properly conducted. *Brown v. Dretke*, 419 F.3d 365, 377 (5th Cir. 2005).

In his federal habeas petition, Petitioner argues the TCCA refused to adjudicate the merits of this claim, and instead denied his application without written order less than thirty days after receiving it. This is incorrect. The Fifth Circuit has held that, "[u]nder Texas law a denial of relief by the Court of Criminal Appeals serves as a denial of relief on the merits of the claim." *Barrientes v. Johnson*, 221 F.3d 741, 780 (5th Cir. 2000) (quoting *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000)). Under the AEDPA, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough*, 541 U.S. at 664). The state appellate court's reasoning in denying this claim was detailed and thorough and Petitioner has failed to show that fairminded jurists could disagree with it. Accordingly, this claim is denied.

### 3. Ineffective Assistance of Trial Counsel (claim 5)

Lastly, Petitioner argues he received ineffective assistance of counsel when his trial counsel failed to investigate, failed to pursue a speedy trial, failed to object to hearsay witnesses, and failed to object to the State's statement in closing argument that "this is the murder weapon."

The Sixth Amendment to the United States Constitution guarantees citizens the assistance of counsel in defending against criminal prosecutions. U.S. CONST. amend VI. Sixth Amendment claims based on ineffective assistance of counsel are reviewed under the familiar two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner cannot establish a violation of his Sixth Amendment right to counsel unless he demonstrates (1) counsel's performance was deficient and (2) this deficiency prejudiced the petitioner's defense. *Id.* at 687-88, 690. The Supreme Court has emphasized that "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

When determining whether counsel performed deficiently, courts "must be highly deferential" to counsel's conduct and a petitioner must show that counsel's performance fell beyond the bounds of prevailing objective professional standards. *Strickland,* 466 U.S. at 687-89. Counsel is "'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Burt*, 571 U.S. at 22 (quoting *Strickland*, 466 U.S. at 690). To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Under this prong, the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693). A habeas petitioner has the burden of proving both prongs of the *Strickland* test. *Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

Ineffective assistance of counsel claims are considered mixed questions of law and fact and are analyzed under the "unreasonable application" standard of 28 U.S.C. § 2254(d)(1). *See Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010). When the state court has adjudicated the claims on the merits, a federal court must review a petitioner's claims under the "doubly

18

deferential" standards of both *Strickland* and Section 2254(d). *See Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (citing *Cullen*, 563 U.S. at 190). In such cases, the "pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standard," but whether "the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S at 101.

Petitioner had two attorneys appointed as trial counsel, Mr. William Jack Browning and Mr. H. Curtis Woodcock. Mr. Browning responded to his allegations in an affidavit filed before the state habeas court as follows:

> Our theory in this case was that the Defendant was not guilty and that the investigation by Austin Police Department was sloppy and unprofessional. Specifically - we attacked the DNA evidence (both the handling and the lab work). We attacked the APD investigation (or lack there of) - especially their failure to properly investigate alternate suspects and to properly control and handle the crime scene.
>
> We secured a mental health mitigation expert - Dr. Fabian.
> We secured a DNA expert - Dr. Ryan.
> We secured a mitigation expert - Katherine Mayer
> We secured an investigator - Mark Gillespie
>
> Our efforts were so successful that previously to the final trial - we obtained a mistrial on this case due to APD not providing all available evidence. The Defense Team - worked together to process the discovery and come up with a viable trial strategy for the Defendant.

(ECF No. 26-12 at 9.)

Mr. Woodcock also filed an affidavit, attesting to the following:

I served as co-counsel to William Jack Bowning at the trial court level in the above referenced matter. Our theory in the case was that the Defendant was not guilty and that the investigation by the Austin Police Department was sloppy and unprofessional. Just a few of the more salient points we made were as follows:

> We demonstrated that the police never tested crucial evidence that may have implicated other individuals such as an alternative murder weapon as well as the victim's hand and fingernail samples.
>
> We elicited admissions from State witnesses that it would be reasonable to expect to find the victim's blood on the assailant's clothing and yet our

> client's white clothing was unmarked and appeared to have been the same as clothing he was wearing in video footage taken earlier in the day of the murder.
>
> We pointed out that it was unclear whether the scene was secured properly when officers entered the home near the same time as witnesses reported seeing someone run through a nearby alley and hear a fence rattle.
>
> We presented evidence from a DNA expert to undermine the State's DNA evidence.
>
> In addition, we followed the State's presentation of evidence and argument closely and objected where appropriate. A prime example of this would be our objection to the State eliciting the lead Detective's opinion that our client was the murderer. This objection was overruled, and the Detective was allowed to give her opinion. Upon review the Appellate Court found that this opinion testimony should not in fact have been allowed, however the Court noted that the testimony was nevertheless harmless because - in addition to other factors - the overall impact of our cross examination and presentation of evidence in the case effectively rebutted and refuted the Detective's opinion.

(*Id.* at 11-12.)

Under *Strickland*, a reasonable investigation requires, at minimum, that trial counsel interviews potential witnesses and makes an independent investigation of the facts and circumstances of the case. *Kately v. Cain*, 704 F.3d 356, 361 (5th Cir. 2013). In assessing the reasonableness of counsel's investigation, a heavy measure of deference is applied to counsel's judgments and is weighed along with the defendant's own statements and actions. *Strickland*, 466 U.S. at 691. Trial counsel also has wide latitude in determining trial strategy. *See Ward v. Stephens*, 777 F.3d 250, 264 (5th Cir. 2015). In fact, "[d]efense counsel's 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Mejia*, 906 F.3d at 316 (quoting *Rhoades v. Davis*, 852 F.3d 422, 434 (5th Cir. 2017)). Further, "Strickland does not allow second guessing of trial strategy and must be applied with keen awareness that this is an after-the-fact inquiry." *Granados v. Quarterman*, 455 F.3d 529,

534 (5th Cir. 2006). As a result, an unsuccessful trial strategy does not mean that counsel's performance was deficient. *Avila v. Quarterman*, 560 F.3d 299, 314 (5th Cir. 2009).

With regard to Petitioner's claims that his trial counsel were ineffective because they failed to investigate and failed to pursue a speedy trial, Petitioner does not explain or argue how counsel failed to investigate, what counsel would have uncovered had they properly investigated, and how the failure to do so prejudiced Petitioner's trial. This is likewise true of his speedy-trial claim. Based solely on the conclusory nature of these claims, they must be denied. *United States v. Demik*, 489 F.3d 644, 646 (5th Cir. 2007) ("conclusory allegations are insufficient to raise cognizable claims of ineffective assistance of counsel") (quoting *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000)). Further, Mr. Browning and Mr. Woodcock attested to having investigated the case with diligence, and it is reasonable to assume the TCCA, in denying these claims, credited their affidavits and found no deficient performance. The Court therefore finds that the state habeas court's application of *Strickland* to Petitioner's claims that his trial counsel failed to investigate and failed to pursue a speedy trial was not unreasonable, and these claims are denied.

Petitioner next argues that his trial counsel provided ineffective assistance when they failed to object to two witnesses who lived in same building as Petitioner; he argues counsel should have objected to their testimony based on hearsay and credibility. (ECF No. 1-3 at 16.) Petitioner does not elaborate on these allegations, and it is therefore unclear what testimony Petitioner believes was objectionable, and how his counsels' failure to object prejudiced the outcome of Petitioner's trial. An attorney's "failure to make a frivolous objection does not cause counsel's performance to fall below an objective level of reasonableness." *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998). The Court cannot determine whether the objections would have been frivolous because Petitioner makes no factual allegations the Court can review. Again, Petitioner's conclusory

allegations are insufficient to raise a cognizable claim of ineffective assistance of counsel. *See Demik*, 489 U.S. at 646. As a result, the state habeas court's application of *Strickland* to this claim was not unreasonable, and it is denied.

Finally, Petitioner argues that trial counsel was ineffective when they failed to object to the State's statements during closing argument that "this is the murder weapon" or that Petitioner "was the perpetrator of this crime." (ECF No. 1-3 at 16.) The Court cannot locate the second statement in the trial transcript of closing arguments. (ECF No. 25-11.) Regarding the first statement, it is unclear whether counsel's objection would have been sustained. The statement about "the victim's blood is on the blade"—to which counsel did object—came immediately after the State's statement about the murder weapon. The appellate court found that statement about the victim's blood to be a reasonable deduction from the evidence, and it therefore seems reasonable that the trial court would have either overruled an objection to the murder weapon statement or denied a motion for a mistrial, much as it did for the victim's blood statement. Petitioner has failed to show that the TCCA's rejection of this claim was an unreasonable application of *Strickland*. It is denied.

## IV. Certificate of Appealability

A petitioner may not appeal a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the district court must issue or deny a certificate of appealability (COA) when it enters a final order adverse to the applicant. *See Miller-El v. Cockrell,* 537 U.S. 322, 335-36 (2003) (citing 28 U.S.C. § 2253(c)(1)).

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). In cases where a district court rejects a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable

jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a district court rejects a habeas petition on procedural grounds without reaching the constitutional claims, "a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the dismissal or denial of Petitioner's § 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El*, 537 U.S. at 327 (citing *Slack*, 529 U.S. at 484). Accordingly, the Court will not issue a certificate of appealability.

It is therefore **ORDERED** that Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (ECF No. 1) is **DENIED**; and

It is finally **ORDERED** that a certificate of appealability shall not issue in this case.

SIGNED this 16th day of July, 2024.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE